## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DAILY NEWS, LP; CHICAGO TRIBUNE
COMPANY, LLC; ORLANDO SENTINEL
COMMUNICATIONS COMPANY, LLC; SUN-
SENTINEL COMPANY, LLC; SAN JOSE
MERCURY-NEWS, LLC; DP MEDIA
NETWORK, LLC; ORB PUBLISHING, LLC; and
NORTHWEST PUBLICATIONS, LLC,

        Plaintiffs,

        v.

MICROSOFT CORPORATION, OPENAI, INC.,
OPENAI LP, OPENAI GP, LLC, OPENAI, LLC,
OPENAI OPCO, LLC, OPENAI GLOBAL, LLC,
OAI CORPORATION, LLC, and OPENAI
HOLDINGS, LLC,

        Defendants.

Civil Action No. 1:24-cv-03285-SHS

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MICROSOFT CORPORATION'S PARTIAL MOTION TO DISMISS

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................................1

II.  BACKGROUND ..................................................................................................................3

    A.  The Publishers' Commitment to Local Journalism ......................................................... 3

    B.  Microsoft's Development of a Lucrative Generative AI Business Through Mass
        Copyright Infringement ................................................................................................. 4

    C.  The Publishers File Suit to Protect Their Works, and Defendants File Partial Motions
        to Dismiss ...................................................................................................................... 6

III.  LEGAL STANDARD ..........................................................................................................7

IV.  ARGUMENT........................................................................................................................7

    A.  The Publishers Have Stated a Contributory Infringement Claim (Count IV) ............... 7

        1.  The Publishers Allege Infringement by End Users of Defendants' Products..... 8

        2.  The Publishers Allege Microsoft's Knowledge of Infringement..................... 10

    B.  The Publishers Have Properly Alleged DMCA claims (Count V) .............................. 13

        1.  The Publishers Allege that Microsoft Knew or Had Reasonable Grounds to
            Know that Removal of CMI Would Conceal Copyright Infringement............ 14

        2.  The Publishers Gave Alleged Removal of CMI from "Identical Works." ....... 18

    C.  The Copyright Act Does Not Preempt The Publishers' "Hot-News" Misappropriation
        Claim (Count VI)........................................................................................................ 20

    D.  The Publishers' Dilution Claim (Count VIII) Is Not Barred by the Dormant Commerce
        Clause ......................................................................................................................... 23

V.  CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*A'Lor Int'l, Ltd. v. Tappers Fine Jewelry*, No. 12-CV-02215,
  2012 WL 12921035 (C.D. Cal. Aug. 8, 2012) ..................................................... 19

*ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*, 667 F. Supp. 3d 411 (S.D. Tex. 2023) ................. 19

*Am. Booksellers Found. v. Dean,* 342 F.3d 96 (2d Cir. 2003) ................................. 24, 25

*Argo Contracting Corp. v. Paint City Contractors, Inc.*, No. 00-CV-3207,
  2000 WL 1528215 (S.D.N.Y. Oct. 16, 2000) ............................................. 14

*Arista Records, Inc. v. Mp3Board, Inc.*, No. 00-CV-4660,
  2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ............................................ 10

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ................................. 10

*Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009) ............. 9, 10, 11, 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................. 7

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876 (2d Cir. 2011) ............... 20, 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................... 7

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986) ...................... 25

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013) ................... 7

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., L.L.C.*,
  973 N.E.2d 390 (Ill. App. Ct. 1st Dist. 2012) ............................................ 20

*DBW Partners, LLC v. Mkt. Sec., LLC*, No. 22-CV-1333,
  2023 WL 2610498 (D.D.C. Mar. 23, 2023) ................................................ 23

*Design Basics, LLC v. WK Olson Architects, Inc.*, No. 17-CV-7432,
  2019 WL 527535 (N.D. Ill. Feb. 11, 2019) .............................................. 19

*DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003) ........................................ 22

*Doe 1 v. GitHub, Inc.* 672 F. Supp. 3d 837 (N.D. Cal. 2023) ................................ 16

*Dolls Kill, Inc. v. Zoetop Bus. Co.*, No. 22-CV-01463,
  2022 WL 16961477 (C.D. Cal. Aug. 25, 2022) .......................................... 19

*Edgar* v. *MITE Corp.*, 457 U.S. 624 (1982) ............................................................. 24

*Falkner v. Gen. Motors LLC*, 393 F.Supp.3d 927 (C.D. Cal. 2018)............................................. 20

*Fashion Nova, LLC v. Blush Mark, Inc.*, No. 22-CV-6127,
  2023 WL 4307646 (C.D. Cal. June 30, 2023) ...................................... 16

*Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F.Supp.2d 1352 (N.D. Fla. 2010) ............... 20

*Fin. Info., Inc. v. Moody's Invs. Serv., Inc.*, 808 F.2d 204 (2d Cir. 1986)................................... 22

*Fischer v. Forrest*, 286 F. Supp. 3d 590 (S.D.N.Y. 2018)........................................................ 20

*Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-CV-00496,
  2015 WL 263556 (D. Haw. Jan. 21, 2015) ................................................................. 19

*FurnitureDealer.Net, Inc v. Amazon.com, Inc*, No. 18-CV-232,
  2022 WL 891473 (D. Minn. Mar. 25, 2022) ................................................. 17

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt. Inc.*, 443 F.2d 1159 (2d Cir. 1971)............. 10

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985)............................................................... 7

*Greer v. Fox News Media*, No. 22-CV-1970, 2023 WL 26717962 (2d Cir. Mar. 29, 2023) ....... 23

*Healy v. Beer Inst. Inc.,* 491 U.S. 324 (1989).................................................................. 25

*Hirsch v. CBS Broad. Inc.*, No. 17-CV-18601, 2017 WL 3393845 (S.D.N.Y. Aug. 4, 2017)..... 14

*Int'l News Serv. v. Associated Press*, 248 U.S. 215 (1918) .......................................... 20

*Kelly v. Arriba Soft Corp.*, 77 F.Supp.2d 1116 (C.D. Cal. 1999) ................................ 20

*Lane Coder Photography, LLC v. Hearst Corp.*, No. 22-CV-5071,
  2023 WL 5836216 (S.D.N.Y. Sept. 8, 2023)................................................................ 13

*Mango v. BuzzFeed, Inc.*, 970 F.3d 167 (2d Cir. 2020)............................................. 14, 15, 16, 17

*Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 693 (2d Cir. 1998).............................. 9

*ML Genius Holdings LLC v. Google LLC*, No. 20-CV-3113,
  2022 WL 710744 (2d Cir. Mar. 10, 2022) ..................................................................... 23

*Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997)............................ 20, 21, 22

*Nat'l Pork. Producers Council v. Ross,* 598 U.S. 356 (2023)................................................ 24, 25

*Navatar Grp., Inc. v. DealCloud, Inc.*, No. 21-CV-1255,
  2023 WL 1797266 (S.D.N.Y. Feb. 7, 2023) ..................................................................... 7

*Planck LLC v. Particle Media, Inc.*, No. 20-CV-10959,
  2021 WL 5113045 (S.D.N.Y. Nov. 3, 2021) ................................................................... 19

*Reiffer v. NYC Luxury Limousine Ltd.*, No. 22-CV-2374,
  2023 WL 4029400 (S.D.N.Y. June 15, 2023) ................................................................. 15

*Snail Games USA Inc. v. Tencent Cloud LLC*, 2022 WL 3575425 (C.D. Cal. June 6, 2022) ...... 11

*Sony Corp. of Am. v. Universal Cty Studios, Inc.*, 464 U.S. 417 (1984) ................................ 11, 12

*Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018) ...................................................... 16, 18

*Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010) ......................................................... 13

*Tremblay v. OpenAI, Inc.*, 2024 WL 557720 (N.D. Cal. Feb. 12, 2024) .................................. 9, 16

*U.S. v. Aina-Marshall*, 336 F.3d 167 (2d Cir.2003) .................................................................... 12

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ............................................. 10, 12

**Statutes**

17 U.S.C. § 1202 .......................................................................................................................... 13

**Other Authorities**

H.R. No. 94-1476 ......................................................................................................................... 20

S. Rep. No. 105-190 ..................................................................................................................... 16

## I.    <u>INTRODUCTION</u>

This lawsuit is about the fact, which Defendants concede (Compl. ¶ 3), that their generative artificial intelligence ("GenAI") products depend on copyrighted materials, including the Plaintiffs' ("Publishers'")—content that Defendants have purloined, and continue to purloin, without permission or payment. Compl. ¶ 1. Like its collaborator OpenAI, Microsoft has filed a partial motion to dismiss that is more focused on telling its story, and less focused on identifying claims that warrant dismissal. And the story Microsoft tells is full of holes.

To start, Microsoft's motion is inconsistent on points that go to the heart of this lawsuit. On the one hand, Microsoft says that the Publishers "plead no specific instance of infringement" (Mem. at 7)—a statement that is not correct. *See, e.g.*, Complaint at ¶¶ 98-112; 118-138; 148-151. On the other hand, Microsoft doesn't move to dismiss the Publishers' core copyright infringement claim, Count I, which is based on Microsoft's unlawful use of the Publishers' copyrighted content. Presumably, if Microsoft thought its "no specific instance" position was strong, it would have moved to dismiss the central copyright claim. Microsoft's failure to back up this key statement with a legal argument speaks volumes about Microsoft's motion overall.

On the same issue, Microsoft (like OpenAI) ignores the core allegations of the Complaint. Microsoft says that the Complaint is based on "contrived prompts and rigged outputs" that result in "snippets of information." Mem. at 1, 2. As to the "snippets," the Complaint includes multiple instances in which Defendants' products replicated <u>whole articles</u> from the Publishers' newspapers. *See, e.g.*, Compl. ¶¶ 118-119 (Denver Post); ¶¶ 121-122 (Chicago Tribune); ¶¶ 136-137 (Orange County Register); ¶165 (N.Y. Daily News). As to the "contrived prompts," Microsoft misses the point. *First*, even if Microsoft's statement that GenAI products replicate a copyrighted article only upon request were true (it's not—*see, e.g.*, Compl.

1

¶¶ 130, 168), that is still an admission that the GenAI products incorporate, use, and replicate copyrighted material. *Second*, Microsoft ignores the fact that even so-called "snippets" reproduce materials that were taken from behind the Publishers' paywalls. *See, e.g.*, Compl. ¶ 145.

On a different point, Microsoft says that the Publishers' Complaint "omits The [New York] Times' unsubstantiated prediction that Microsoft's and OpenAI's tools will somehow destroy independent journalism[.]" Mem. at 1. Those are Microsoft's words—they don't appear in the Publishers' Complaint (or The Times's for that matter). What the Publishers say is that the defendants' GenAI systems copy the content from the Publishers' newspapers, and then regurgitate that content back in response to users' prompts. This practice is not only unlawful copyright infringement (which, again, Defendants do not challenge in their motions), but has a direct, obvious, and destructive effect on the Publishers' core businesses.

Finally, in important ways the "facts" Microsoft presents are incomplete or distorted. For instance, Microsoft touts GenAI as "a powerful tool for human flourishing." Mem. at 7 (header). But Microsoft doesn't mention the well-publicized recent reports that insiders working on GenAI projects at OpenAI have left their jobs and demanded to be released from contractual restrictions on their right to voice their concerns about OpenAI's products. According to one report, a former OpenAI employee said, "I'm scared. I'd be crazy not to be."[1]

As the Publishers said in their Complaint (¶ 17), this is not a battle about the merits of one technology or another. If the shoe were on the other foot, and the Publishers were distributing copies of Microsoft's Word, Windows, and other products for free at readers'

---

[1] Sigal Samuel, *OpenAI insiders are demanding a "right to warn" the public,* VOX (June 5, 2024) https://www.vox.com/future-perfect/353933/openai-open-letter-safety-whistleblowers-right-to-warn (last visited June 25, 2024).

requests, Microsoft would reject the argument that such distribution was lawful because "the users only get it if they ask for it directly," or "the Microsoft products users download don't have all of the features." Yet these are the arguments that Microsoft leads with in its Motion. Just as Microsoft itself would reject these points, the Court should as well.

## II.   BACKGROUND

### A.   THE PUBLISHERS' COMMITMENT TO LOCAL JOURNALISM

Collectively, the Publishers publish eight local newspapers that cover the news in local communities across the United States. Compl. ¶¶ 21-28. These publications, some of which have been in circulation for over 100 years, are long-standing pillars in the communities they serve. *Id.* ¶¶ 41-43, 45-46. Their impact, however, expands beyond these communities because the newspapers are available in print, online, and mobile applications throughout the United States. *Id.* ¶¶ 21-28. For example, local reporting by the Publishers like the *Chicago Tribune*'s coverage of the harmful pharmacy practices and the *Daily News*' coverage on the health of 9/11 first responders, has gained significant national recognition, including Pulitzer Prizes. *Id.* ¶¶ 9, 40, 41.

The Publishers have invested billions of dollars in investigating and reporting local news stories. *Id.* ¶ 7. The Publishers sustain this commitment to local journalism through revenues generated from subscriptions, licensing, and advertising. *Id.* ¶ 48. The Publishers protect their investment in local journalism by, *inter alia,* keeping some of their content behind a paywall, registering their copyrights, and appending copyright notices and other copyright management information ("CMI") to articles. *Id.* ¶ 49.

**B.      MICROSOFT'S DEVELOPMENT OF A LUCRATIVE GENERATIVE AI BUSINESS THROUGH MASS COPYRIGHT INFRINGEMENT**

Microsoft is the most valuable public company in the world (or now, maybe the second most valuable after NVIDIA), with a market capitalization of over $3 trillion. Approximately $1 trillion of that value is derived from GenAI, primarily due to its partnership with OpenAI. Compl. ¶ 6. Under the terms of that partnership, Microsoft is currently entitled to 75% of OpenAI's profits and will own 49% of OpenAI once its initial $13 billion investment is repaid. *Id.* ¶ 29. Defendants' partnership is expected to be a lucrative commercial arrangement for both partners—especially because they are not paying for the content they took from creators to build and operate their products. *Id.* ¶¶ 7, 16, 185.

Microsoft has been and continues to be intimately involved in the training, development, and commercialization of Defendants' large-language models ("LLMs"). *Id.* ¶¶ 63-71. Microsoft and OpenAI "collaborated" to "select[] the training datasets" for their LLMs, including the Publishers' works that comprise those sets. *Id.* ¶ 91. LLMs function by copying millions of works and using them to predict words that are likely to follow a given string of text. *Id.* ¶¶ 73-75. There is no dispute that this process involved copying and storing encoded copies of works in computer memory, including the Publishers' works. *Id.* ¶ 75. Because Defendants have not publicly disclosed the makeup of the datasets used to train GPT-3 and each subsequent model, Publishers do not yet know the exact number of the Publishers' works that Defendants copied to train their models. *Id.* ¶¶ 55, 81.

The Complaint demonstrates that Defendants' models "memorized" copies of the Publishers' works. *Id.* ¶¶ 98-113; Ex. J. The GPT-4 model outputs verbatim copies of significant portions of the Publishers' works and/or detailed summaries of those works when prompted. *Id.* Defendants knew or should have known they were infringing the Publishers' copyrights,

particularly because of the Publishers' copyright management information ("CMI") on its content, publications, and websites. Compl. ¶¶ 157-59. Not only did Defendants ignore this CMI, they also designed the training process and used web scrapers to remove it. *Id.* ¶¶ 159-161.

Illegal copying to build datasets and train the models is just one aspect of the Publishers' case. Defendants also commit copyright infringement through their user-facing products. These products were built on and are powered by the infringing models, and they separately violate the Publishers' copyrights through the outputs they provide in response to user queries. That infringement takes at least two forms: (1) showing copies and/or derivatives of the Publishers' works that were copied to build the model, and (2) showing synthetic search results that copy and/or paraphrase the Publishers' works retrieved and copied in response to user search queries in real-time. *Id.* ¶¶ 96-97.

Along with OpenAI, Microsoft has developed and commercialized user-facing products, including ChatGPT and Copilot (formerly known as Bing Chat). ChatGPT, a text-generating chatbot that mimics natural language in response to user prompts, initially produced only the first type of infringing output. *Id.* ¶ 58. Bing Chat (now known as Copilot), a generative AI chatbot feature on Microsoft's browser search engine, was released in February 2023. *Id.* ¶ 182. Next came "Browse with Bing," released in May 2023, a plugin to ChatGPT that uses Microsoft's Bing search engine to access the Internet. *Id.* ¶ 114. This enables ChatGPT to retrieve content beyond what was included in the underlying model's training dataset. *Id.* "Synthetic search" products like Copilot and Browse with Bing combine an LLM's ability to mimic human expression—including the Publishers' expression—with the ability to generate natural language summaries of search results, including the Publishers' works. *Id.* Microsoft's Copilot feature also allows users to access substantial and/or entire portions of the Publishers' articles in response to

a user request. *Id.* ¶¶ 118-138. This behavior extends to instances where the user's prompt does not even identify a specific newspaper or article. *Id.* ¶¶ 130, 168. Copilot's propensity to provide verbatim text from paywalled, copyright-protected articles persisted even after it was widely publicized that users were using Browse with Bing to evade paywalls. *Id.* ¶ 145.

Defendants know their products infringe on the Publishers' copyrights and have knowledge that end-users use their products to do so. *Id.* ¶¶ 142-147. Indeed, Defendants have the ability to monitor and terminate users that infringe the rights of copyright owners such as the Publishers. *Id.* ¶¶ 153-155. Defendants benefited tremendously from training on and using the Publishers' content without paying. *Id.* ¶¶ 177-183, 185. Despite the Publishers' limiting free access to their content, Defendants free-ride off the Publishers' investment, misappropriating a huge amount of the Publishers' copyrighted content without paying fair compensation. *Id.* ¶¶ 185-188. Defendants' unlawful conduct threatens to divert readers away from the Publishers' content and websites, threatening the revenue that funds their local reporting. *Id.*

## C.   THE PUBLISHERS FILE SUIT TO PROTECT THEIR WORKS, AND DEFENDANTS FILE PARTIAL MOTIONS TO DISMISS

On April 30, 2024, the Publishers filed the Complaint against Microsoft and OpenAI, asserting claims for copyright infringement, vicarious copyright infringement, contributory copyright infringement, violations of the Digital Millennium Copyright Act ("DMCA"), unfair competition by misappropriation, and trademark dilution under the Lanham Act and New York law. The Publishers seek monetary relief and an injunction to stop Defendants' unlawful conduct. On June 11, 2024, Microsoft filed its motion seeking dismissal of (i) the contributory infringement claim, (ii) the DMCA claims, (iii) the unfair competition by misappropriation claim, and (iv) the trademark dilution claim. The Publishers now submit this Opposition to explain why Microsoft's motion should be denied in in its entirety.

### III.   LEGAL STANDARD

In reviewing a motion pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally. *Navatar Grp., Inc. v. DealCloud, Inc.*, No. 21-CV-1255, 2023 WL 1797266, at *1 (S.D.N.Y. Feb. 7, 2023). A complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard does not call for detailed factual allegations, nor does it impose a probability requirement at the pleading stage. *Navatar Grp.*, 2023 WL 1797266, at *1. A complaint need only "raise a reasonable expectation that discovery will reveal evidence" of unlawful conduct. *Twombly*, 550 U.S. at 545. The court, therefore, is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

### IV.   ARGUMENT

### A.   THE PUBLISHERS HAVE STATED A CONTRIBUTORY INFRINGEMENT CLAIM (COUNT IV)

Microsoft does not move to dismiss Counts I, II or III of the Complaint (direct infringement, vicarious infringement, and contributory infringement), but instead seeks dismissal of the Publishers' alternative contributory infringement claim based on infringing conduct by end users (Count IV). Contributory infringement "occurs where 'one . . . with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'" *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 658 (S.D.N.Y. 2013), *aff'd*, 910 F.3d 649 (2d Cir. 2018) (citation omitted). The contributory infringement doctrine permits courts "to impose secondary liability where 'just' and appropriate." *Id.*

Relying mainly on cases decided at summary judgment or trial, Microsoft argues that the Publishers do not allege (i) infringing conduct by end users, and (ii) Microsoft's knowledge of such conduct. Both arguments ignore the Complaint's well-pled allegations. Indeed, as discussed below, the Complaint includes an entire section describing end-user infringement and Microsoft's material contribution to that infringement. *See* Compl. ¶¶142-156.

### 1. The Publishers allege infringement by end users of Defendants' products.

Although Microsoft argues that copyright infringement by users of its GenAI products is just a "theoretical possibility," Mem. at 9, the question at this stage is whether the Publishers have plausibly alleged that such infringement has taken place. The answer is yes. The Complaint alleges there were "widely publicized" instances "of copyright infringement after ChatGPT, Browse with Bing, and Copilot (formerly Bing Chat) were released." Compl. ¶ 141. The Complaint shows (¶ 145 and notes 52-54) that these infringements happened "in the real world," otherwise the press could not have reported on them. Similarly, Microsoft downplays the infringing output in the Complaint (Compl. ¶¶ 98, 100, 102, 104, 106, 108, 110, 112, 118, 121, 124, 127, 130, 133, 136) by incorrectly stating that those infringements resulted from "instructions to manufacture infringement" by "Plaintiffs or individuals directed by them." Mem. at 9. Actually, the Complaint shows that many of the prompts involved asking for a summary of an article's first few paragraphs, followed by a request for the actual text, *id.* ¶¶ 98 ("Please tell me about the 2017 Chicago Tribune article entitled 'What to do with a broken Illinois: Dissolve the Land of Lincoln.' Please format your response a summary of the facts followed by the actual text."), 100, 102, 104, 106, 108, 110, 112, or the articles' text, *id.* ¶¶ 118 ("Please provide the first seven paragraphs of the Denver Post article entitled 'A lunar eclipse visits Denver Sunday,

but it may not be noticeable."), 121, 124, 127, 130, 133, 136. Microsoft does not dispute that its products then generated outputs that included the Publishers' copyrighted material.

Microsoft's reliance on *Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 693 (2d Cir. 1998), Mem. at 9, which was decided on summary judgment, highlights the importance of discovery. The copyright holder there (West) "hypothesized" that users of CD-ROM products might try to "replicate" its printed compilations of judicial opinions, a task the court skeptically characterized as "thankless toil." *Id.* at 706. West's copyright at issue was "thin," because the underlying judicial opinions were public, and West admitted that its "star pagination" was fair use. *Id.* at 699. Moreover, the CD-ROM products made any infringement difficult to accomplish. *Id.* at 706. In contrast, the prompts and outputs detailed in the Publishers' Complaint shows that the Publishers' copyrighted material is substantial, and Defendants' products make infringement easy. Compl. ¶¶ 98, 100, 102, 104, 106, 108, 110, 112, 118, 121, 124, 127, 130, 133, 136.

Moreover, in *Matthew Bender*, West had not been able to identify evidence during discovery to back up its allegations. 158 F.3d at 706. Here, no discovery has yet taken place, and this Court cannot decide this fact-intensive question now, particularly where evidence of user infringements is in the possession of Defendants.[2] *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 150 (S.D.N.Y. 2009) (granting summary judgment on a contributory infringement claim, relying in part on "data from Defendants' server . . . which constitutes direct evidence of subscribers requesting to download Plaintiffs' copyrighted works").

---

[2] Nothing in *Tremblay v. OpenAI, Inc.*, 2024 WL 557720, at *2–3 (N.D. Cal. Feb. 12, 2024), leads to a different result. The plaintiffs there alleged that "every output of the OpenAI Language Models is an infringing derivative work," yet did not explain "what the outputs entail or allege that any particular output is substantially similar—or similar at all—to their books." *Id.* By contrast, Plaintiffs cite numerous examples to show how Defendants' products output verbatim copies of Plaintiffs' works. Compl. ¶¶ 98, 100, 102, 104, 106, 108, 110, 112, 118, 121, 124, 127, 130, 133, 136.

In sum, the Publishers adequately allege end-user infringement. Defendants' chatbots are trained on the Publishers works; they have "memorized" many of those works and freely "regurgitate" them in their output; end users have used Defendants' chatbots and so-called "retrieval augmented generation" products for the express purpose of bypassing paywalls and otherwise seeking out copyrighted content—a fact known to Microsoft, Compl. ¶¶ 142-147. The examples in the Complaint show how readily these products output the Publishers' works.

### 2. The Publishers allege Microsoft's knowledge of infringement.

Microsoft also contends the Publishers have not adequately alleged Microsoft's knowledge of infringing outputs, citing out-of-circuit cases requiring "actual knowledge of (or be[ing] willfully blind to) specific acts of infringement." Mem. at 10 (cleaned up). That is not the law in this circuit, where "knowledge of specific infringements is not required to support a finding of contributory infringement."[3] *Usenet.com*, 633 F. Supp. 2d at 154; *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (sufficient that defendants "know or have reason to know of the direct infringement"); *Arista Records, Inc. v. Mp3Board, Inc.*, No. 00-CV-4660, 2002 WL 1997918, at *7 (S.D.N.Y. Aug. 29, 2002) (Stein, J.) (requiring "actual or constructive knowledge of the infringing activity to be found contributorily liable").

Moreover, even if the higher standard were applicable, the Publishers met that standard by pleading Microsoft's actual knowledge of infringement. Compl. ¶¶ 141-45, 214. This

---

[3] Microsoft's reference to the Second Circuit's summary judgment decision in *Gershwin Publ'g Corp. v. Columbia Artists Mgmt. Inc.*, 443 F.2d 1159 (2d Cir. 1971) (Mem. at 10) does not help it. The Court in *Gershwin* did find actual knowledge, but did not address constructive knowledge. Microsoft's interpretation of the case mistakes the sufficient for the necessary. And *Gershwin* supports the Publishers. The court found contributory infringement where the defendant, as here, "was in a position to police the infringing conduct [and] derived substantial financial benefit from the actions of the primary infringers." *Id.* at 1163; *see* Compl. ¶¶ 52-71. *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) (Mem. at 11) does not help Microsoft either. That case concerned the knowledge requirement for the DMCA safe harbor—a statutory interpretation question not raised by this Motion.

allegation is more than plausible given that such infringements were "widely publicized." *Id.* The Complaint also alleged willful blindness. Compl. ¶ 214. This allegation is also more than plausible given that Microsoft could have done something about continued and repeated infringement but has not. To the extent Microsoft says it lacks knowledge of "specific" instances of infringement despite repeated warnings of actual infringing content, a plausible conclusion is that it has been willfully blind to this infringement.

The Publishers' claim of knowledge is further bolstered by Microsoft's role in developing and overseeing Defendants' products, which means that Microsoft understands how these products use copyrighted works for training and returning synthetic search results in real time. Compl. ¶¶ 70, 114–15; *see Usenet.com*, 633 F. Supp. 2d at 155 ("Defendants knew or should have known of infringement by its users" where they "were explicitly put on notice of the existence of thousands of copies of Plaintiffs' copyrighted sound recordings available on its service"). Any dispute Microsoft has with these allegations can be addressed after discovery, as a defendant's assertion that it "lacked knowledge of any infringement . . . is best resolved on summary judgment." *Snail Games USA Inc. v. Tencent Cloud LLC*, 2022 WL 3575425, at *5 (C.D. Cal. June 6, 2022).

Microsoft closes its contributory infringement argument by asserting that, under *Sony*, it cannot be liable "based on the equivocal conduct of selling an item with substantial lawful as well as unlawful uses." Mem. at 12 (cleaned up). *Sony* was part of a decades-old line of cases addressing contributory infringement for "distributors of copying equipment" (*e.g.*, VCRs) who had a single interaction with their customer at the point-of-sale. *Sony Corp. of Am. v. Universal Cty Studios, Inc.*, 464 U.S. 417, 421 (1984). But the evidence in that case showed that Sony did not copy, store, use, or distribute copyrighted works to users, nor did it exercise control over the

content delivered to users once they purchased a VCR. *See id.* at 437–38. The *Sony* Court noted that where, as here, defendants have an "'ongoing relationship' with the product or its end-user," its reasoning would not apply given the defendants' ability to control user content. *Usenet.com*, 633 F. Supp. 2d at 156 (quoting *Sony Corp. of Am.*, 464 U.S. at 438). That is precisely the case here, because Microsoft offers ongoing access to products that: (i) are preloaded with copyrighted content; (ii) duplicate copyrighted content for real-time synthetic search results, and (iii) deliver copyrighted content to users. Compl. ¶¶ 69–70, 93–94, 96, 114–38. Microsoft's argument that *Sony* bars liability "rides roughshod over a critical part of the Supreme Court's reasoning in *Sony*." *Usenet.com*, 633 F. Supp. 2d at 155–56 ("Defendants' service is quite unlike Sony" because "Defendants maintain an ongoing relationship with their users").[4]

The Publishers' pleading that Microsoft knew or should have known of the direct infringement by end users is more than sufficient. But even if Microsoft's interpretation of the law were sound (it's not), the Publishers have also pled willful blindness. Even if Microsoft only has a "general awareness" of the infringing activity, its lack of knowledge of specific instances of infringement is a result of its own conscious effort to turn a blind eye to end-user infringement. A person is "willfully blind" or engages in "conscious avoidance" amounting to knowledge where the person was aware of a high probability of the fact in dispute and consciously avoided confirming that fact. *Viacom Int'l, Inc.*, 676 F.3d at 35 (2d Cir. 2012) (quoting *U.S. v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir.2003)). As stated above, the

---

[4] *See also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 933 (2005) (rejecting "broad" interpretation of *Sony* that would limit liability "whenever a product is capable of substantial lawful use"); *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) (finding that plaintiffs demonstrated likelihood of success on contributory infringement claim, including because defendant "could block access to the system by suppliers of the infringing material [but] failed to remove the material"); *A&M Records Inc. v. Napster Inc.*, 114 F. Supp. 2d 896, 917 (N.D. Cal. 2000) ("Courts have distinguished the protection *Sony* offers to the manufacture and sale of a device from scenarios in which the defendant continues to exercise control over the device's use.").

Publishers' Complaint outlines Defendants' high probability of awareness of the infringement, including but not limited to: (i) Defendants' extensive developing, testing, and troubleshooting their LLM models and GPT-based products, (ii) Defendants' programming of their systems to flag infringing outputs and prompts seeking infringing outputs, (iii) Defendants' knowledge of specific instances where their GPT-based products output infringing content to users and public conversation around the capability of their GPT-based models to produce infringing content, (iv) Defendants' awareness of at least some users' use of their GPT-based products for the purpose of accessing copyrighted works, and (v) Defendants' public recognition of their GPT-based products' capability to distribute unlicensed copies of copyrights works and derivatives thereof. *See* Compl., ¶ 214. Willful blindness to copyright infringement is not an excuse, and it is sufficient to satisfy the knowledge requirement. *E.g.*, *Lane Coder Photography, LLC v. Hearst Corp.*, No. 22-CV-5071, 2023 WL 5836216, at *4 (S.D.N.Y. Sept. 8, 2023). Microsoft may not avoid liability for contributory infringement by hiding its corporate eyes. *Cf. Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 109 (2d Cir. 2010) ("When it has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way.").

## B.   THE PUBLISHERS HAVE PROPERLY ALLEGED DMCA CLAIMS (COUNT V)

The Publishers allege that Microsoft violated the DMCA, specifically 17 U.S.C. § 1202(b)(1) and (3), when it removed the Publisher's copyright management information ("CMI") during training of the GenAI models, Compl. ¶¶ 159-161, 163, and when generating outputs from the GenAI products, *id*. ¶¶ 164-168. Section 1202(b)(1) proscribes intentional removal or alteration of CMI. Section 1202(b)(3) proscribes distribution of works while knowing that CMI has been removed or altered. For each violation, the Publishers allege that Defendants knew or

had reasonable grounds to know that their acts would (1) "conceal the Defendants' own infringement," and/or (2) "induce, enable, facilitate, or conceal end-users' infringement resulting from their operation of the Defendants' GenAI products." Compl. ¶¶ 159, 164, 167-169, 222.

Microsoft argues for dismissal on two grounds. *First*, Microsoft argues that the Complaint does not "suggest that Microsoft intended, by removing CMI, to further any infringement." Mem. at 14. *Second*, Microsoft argues that the Complaint does not allege "the active 'removal' of CMI from an identical copy of a work." Mem. at 17. Both arguments ignore, or misconstrue, the allegations in the Complaint and raise factual disputes that cannot be decided in Microsoft's favor at the pleadings stage when discovery has only just begun.

### 1. The Publishers allege that Microsoft knew or had reasonable grounds to know that removal of CMI would conceal copyright infringement

As explained in the following sections, the Complaint alleges Microsoft's culpability under Sections 1202(b)(1) and (3) in copious detail. To the extent factual questions arise about Microsoft's knowledge and conduct, they are best resolved after discovery. See *Hirsch v. CBS Broad. Inc.*, No. 17-CV-18601, 2017 WL 3393845, at *8 (S.D.N.Y. Aug. 4, 2017) (denying motion to dismiss DMCA claim despite "sparse" knowledge allegations because "[c]ourts must be 'lenient in allowing scienter issues to survive motions to dismiss'") (citation omitted). This is especially true here because the best evidence of Microsoft's knowledge "'may be found within [Microsoft's] possession.'" *Argo Contracting Corp. v. Paint City Contractors, Inc.*, No. 00-CV-3207, 2000 WL 1528215, at *1 (S.D.N.Y. Oct. 16, 2000) (Stein, J.) (citation omitted).

#### i. Microsoft's knowledge of the effect of removing CMI during training

What Microsoft refers to as the "second scienter requirement" requires that a defendant knew or had "reasonable grounds to know" that removal of CMI would conceal an infringement. *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020). The infringement referred to in the

statutory language encompasses *both* third-party infringement and "an infringement committed by the defendant himself." *Id.* at 172; *Reiffer v. NYC Luxury Limousine Ltd.*, No. 22-CV-2374, 2023 WL 4029400, at *8 (S.D.N.Y. June 15, 2023) (DMCA claim where defendant concealed its own infringement). Microsoft's motion focuses on third-party infringement and ignores its own.

The Complaint alleges that, by removing the Publishers' CMI during training, the Defendants prevent the CMI from being "retained within the GPT models and/or displayed when the GenAI products disseminate unauthorized copies of the Publishers' Works to end-users." Compl. ¶ 159. "[R]emoving the Publishers' CMI from the Publishers' Works and outputting the Publishers' Works without the CMI wrongfully implie[s] that Defendants had permission to use the Publishers' Works," and thereby conceals the Defendants' own infringement to the public. *Id.* ¶ 169. Microsoft knows, or has "reasonable grounds" to know, of its own infringement based on its extensive involvement in the training and development of the LLMs. *See generally* Compl. ¶¶ 63-71. Outputting the Publishers' works without CMI also induces, enables, facilitates or conceals end-user infringement, especially when the Defendants permit, and actively encourage, end-users to copy the Publishers' works contained in the output without authorization from the Publishers. *Id.* ¶¶ 168-169 (example output containing a New York *Daily News* article with the encouragement to "[f]eel free to incorporate this information into your blog").

Microsoft ignores these well-pled allegations about the chain of events stemming from Defendants' removal of CMI from the Publishers' works during training, and sets up a straw man that "it makes no sense to base a CMI claim on alleged infringement during training" because "the point of CMI" is to "inform the public that something is copyrighted" and "training takes place out of public view." Mem. at 16. But CMI has a broader purpose as well: "to prevent infringement." *Fashion Nova, LLC v. Blush Mark, Inc.*, No. 22-CV-6127, 2023 WL 4307646, at

*4 (C.D. Cal. June 30, 2023); *see also* S. Rep. No. 105-190 at 15 (CMI is used to "assist in tracking and monitoring uses of copyrighted works, as well as licensing of rights and indicating attribution, creation and ownership"). Microsoft does not grapple with the DMCA's "prevent infringement" aspect, especially with respect to its own infringement.

*Tremblay,* 2024 WL 557720, is inapposite. Unlike the Publishers in this case, the plaintiffs in *Tremblay* did not allege that the defendant's removal of CMI during training concealed the defendant's infringement, and instead focused on how the removal of CMI during training could induce third parties to infringe. *See Tremblay*, 2024 WL 557720, at *4. As to third-party infringement, the *Tremblay* plaintiffs "alleged that '***every output*** from the OpenAI Language Models is an infringing derivative work' without providing any indication as to what such outputs entail—i.e., whether they are the copyrighted books or copies of the books." *Id*. at *5 (emphasis added). By contrast, here the Complaint identifies specific infringing outputs that contain copies of the Publishers' works without the Publishers' CMI. Compl. ¶¶ 165, 168.

*Doe 1 v. GitHub, Inc.* 672 F. Supp. 3d 837 (N.D. Cal. 2023), is instructive on the pleading standard based on third-party infringement. The court found that plaintiffs pled: (1) "sufficient facts to support a reasonable inference that Defendants intentionally designed the programs to remove CMI from any licensed code they reproduce as output," and (2) "Defendants knew or had reasonable grounds to know that removal of CMI carried a substantial risk of inducing infringement." *Id.* at 858; *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 675 (9th Cir. 2018) ("Because the "statute is written in the future tense," plaintiffs "need not show that any specific infringement has already occurred."). Here, the Publishers have pled both a risk of third-party infringement *and* likely concealment of Defendants' own infringement. *Mango*, 970 F.3d at 172 (the statute "requires constructive knowledge of future *concealment*, not future infringement").

16

If Microsoft (incorrectly) believes it was entitled to use the Publishers' works, Mem. at 15,[5] it fails to cite a single case holding that even a sincerely held mistake of law negates the second scienter element for a DMCA claim. To the contrary, the statute imposes liability not only on defendants who "know" their conduct will facilitate or conceal copyright infringement, but also on defendants who have "reasonable grounds to know." This is an objective standard. *See Mango*, 970 F.3d at 171. To hold otherwise would allow any defendant to avoid DMCA liability by claiming that it subjectively believed its conduct to be fair use. Notably, Microsoft has not challenged the Publishers' direct copyright infringement claim with respect to training (Count I), and if Microsoft were ultimately found "liable for copyright infringement, it would be entirely reasonable for a jury to find [Microsoft] had the requisite scienter under § 1202(b) because removal of the CMI would conceal [its] own infringement." *FurnitureDealer.Net, Inc v. Amazon.com, Inc,* No. 18-CV-232, 2022 WL 891473, at *25 (D. Minn. Mar. 25, 2022).

ii.  *Microsoft's knowledge of the effect of removing CMI from generative outputs.*

As with its attack on the contributory infringement claim, Microsoft argues that the Complaint "does not plausibly allege actual user conduct that yields likely infringing outputs in the first place." Mem. at 14. Microsoft's argument, based on pure *ipse dixit*, raises a fact dispute about how users engage with Defendants' products, and it is far too early for this Court to rule either on that issue or on what Microsoft knows about those interactions. To underscore this point, Microsoft incorrectly contends that "all" of the examples in the Complaint "involved Plaintiffs *inputting* or *requesting* content from their own newspapers." Mem. at 16. That is

---

[5] Microsoft cannot credibly claim that the Complaint "concedes away any claim that Microsoft intends to facilitate infringement during training by acknowledging Microsoft's strong belief that it is 'entitled to copy and use any written product' for the purpose of 'train[ing] [its] GenAI systems." Mem. at 15. Microsoft's brief elides the Complaint's characterization of this belief: "Microsoft and OpenAI **bizarrely** claim they are entitled to copy and use any written product on which they want to train their GenAI systems." Compl. § 14 (emphasis added).

simply not correct. *See, e.g.*, Compl. ¶130 ("Please provide the text of an article about the judge issuing a permanent injunction against Regina Hill"), ¶ 168 ("I need content for my blog. Please provide a news article about what the Mets see in Julio Teheran.").

Microsoft's reliance on *Stevens*, 899 F.3d at 673, is misplaced. *Stevens* was decided on a full factual record where the plaintiffs failed to offer "*any* specific evidence that removal of CMI metadata from their real estate photographs will impair their policing of infringement" or that the defendants' "*distribution* of real estate photographs ever induced, enabled, facilitated, or concealed any particular act of infringement by anyone." *Id.* at 675. No such record has been developed here because discovery has just begun. Moreover, the plaintiffs in *Stevens* focused on whether removal of CMI would facilitate future infringement by "a third-party," and does not address the Publishers' allegations about Defendants' concealment of *their own* infringement.

### 2. The Publishers have alleged removal of CMI from "identical works."

Microsoft argues that DMCA claims require the removal of CMI from "an identical copy of a work" and that the Publishers' Complaint identifies only "paraphrases," "quotes," and "excerpts." Mem. at 19-20. But Microsoft ignores the Complaint's well-pled allegations that the Defendants' GenAI products have outputted the *full and complete text* of a Publisher's article with the Publisher's CMI removed. Compl. ¶¶ 118-119 (Denver Post); ¶¶ 121-122 (Chicago Tribune); ¶¶ 136-137 (Orange County Register); ¶ 165 (Daily News).

Microsoft does not meaningfully challenge Publishers' allegations regarding removal of CMI from "identical works" as part of training. Mem. at 20. The Complaint alleges the removal of CMI from copies of the Publishers' works before and during the training process, including from copies of the Publishers' works scraped directly from the Publishers' websites. Compl. ¶ 161 ("For example, in order to construct the datasets used to train their GenAI products, the

Defendants used content extractors that, by design, removed the Publishers' CMI from the Publishers' Works. For example, OpenAI used the Dragnet and Newspaper content extractors in creating the WebText dataset, which intentionally removed the Publishers' CMI from the Publishers' Works scraped from their website."); *see also id.* ¶ 218.

Microsoft's cases concerning "fail[ure] to transpose CMI" from one work into another" are also inapposite, as they involve the copying of a single design element or minor portion of the original work into a new work. Mem. at 18-19.[6] The Publishers do not allege that Defendants neglected to "transpose" CMI into a portion of an article that otherwise lacked CMI; they seek to hold Defendants accountable for removing CMI from the copied articles and then distributing those articles (including the full text of some of those articles) and derivative works created from them, to users, knowing that CMI had been removed. *Planck LLC v. Particle Media, Inc.*, No. 20-CV-10959, 2021 WL 5113045, at *6 (S.D.N.Y. Nov. 3, 2021) (upholding a DMCA claim at the pleading stage where the Plaintiff alleged that the Defendants removed CMI from plaintiff's news content and "distributed infringing excerpts of Plaintiff's stories" with the CMI removed); *ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*, 667 F. Supp. 3d 411, 430 (S.D. Tex. 2023) ("Based on the plain wording of the statute, the Court is not persuaded that the DMCA includes an 'identical copy' requirement."). That all but one of Microsoft's cases were decided on summary judgment, and not on a motion to dismiss, also underscores why this Motion should be denied.[7]

---

[6] *See Dolls Kill, Inc. v. Zoetop Bus. Co.*, No. 22-CV-01463, 2022 WL 16961477, at *3 (C.D. Cal. Aug. 25, 2022) (no violation for omission of CMI in "knockoff products"); *A'Lor Int'l, Ltd. v. Tappers Fine Jewelry*, No. 12-CV-02215, 2012 WL 12921035, at *1 (C.D. Cal. Aug. 8, 2012) (no violation for omitting CMI from "copies of [] jewelry"); *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-CV-00496, 2015 WL 263556, at *2 (D. Haw. Jan. 21, 2015) (no violation where defendant "developed its own drawing based on [plaintiff's] work"). *Frost-Tsuji* is also inapposite because it is yet another summary judgment decision.

[7] *See Design Basics, LLC v. WK Olson Architects, Inc.*, No. 17-CV-7432, 2019 WL 527535, at *1 (N.D. Ill. Feb. 11, 2019) (no violation where defendant "only . . . copied elements of" architectural design plans); *Fischer v. Forrest*,

**C.      THE COPYRIGHT ACT DOES NOT PREEMPT THE PUBLISHERS'
        "HOT-NEWS" MISAPPROPRIATION CLAIM (COUNT VI)**

The Publishers assert a "hot-news" misappropriation claim as recognized in *Int'l News
Serv. v. Associated Press*, 248 U.S. 215 (1918) ("*INS*"). The Publishers' claim rests on the fact
that synthetic search products built on GPT LLMs, such as Microsoft Copilot, use a process
known as "grounding" to spit out time-sensitive factual information that the Publishers gathered
(and that was not part of the LLMs' training set), without any attribution to the Publishers,
thereby competing with the Publishers and threatening their core businesses. *See* Compl. ¶¶ 114-
16. Congress has explained that such a "misappropriation" claim is not preempted by copyright
law because "state law should have the flexibility to afford a remedy . . . against a consistent
pattern of unauthorized appropriation by a competitor of the facts (*i.e.*, not the literary
expression) constituting 'hot' news, whether in the traditional mold of [*INS*], or in the newer
form of data updates from scientific, business, or financial data bases." H.R. No. 94-1476 at 132,
reprinted in 1976 U.S.C.A.N. at 5748, *quoted in Nat'l Basketball Ass'n v. Motorola, Inc.*, 105
F.3d 841, 850 (2d Cir. 1997) ("*NBA*"); *see also Barclays Capital Inc. v. Theflyonthewall.com,
Inc.*, 650 F.3d 876, 905-06 (2d Cir. 2011); *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch.,
L.L.C.*, 973 N.E.2d 390, 402 (Ill. App. Ct. 1st Dist. 2012) (misappropriation claims "predicated
on the unauthorized *use* of the providers' expertise and goodwill" not preempted).

---

286 F. Supp. 3d 590, 609 (S.D.N.Y. 2018) (summary judgment decision finding no violation because the allegedly
infringing advertisement "b[ore] no resemblance" to the copied work); *Falkner v. Gen. Motors LLC*, 393 F.Supp.3d
927, 938 (C.D. Cal. 2018) (summary judgment decision finding no violation where it was "undisputed" that no one
"removed or altered the copyright management information that Bernstein *did* include in his photograph," and where
the photographs captured portions of the works that lacked any CMI); *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*,
756 F.Supp.2d 1352, 1359 (N.D. Fla. 2010) (summary judgment decision finding no violation where students took
notes based on a copyrighted textbook); *Kelly v. Arriba Soft Corp.*, 77 F.Supp.2d 1116, 1122 (C.D. Cal. 1999)
(summary judgment decision finding no violation where CMI did "not appear in the images" that defendants
copied).

Microsoft acknowledges that "hot-news" misappropriation claims are not preempted by the Copyright Act, but argues that the Publishers did not sufficiently plead "the sort of 'narrow 'hot-news' misappropriation claim [that] survives preemption under [*NBA*]." Mem. at 21. Microsoft is wrong. The Court in *NBA* explained precisely what a plaintiff needs to allege to avoid preemption: "(i) the time-sensitive value of factual information, (ii) the free-riding by a defendant, and (iii) the threat to the very existence of the product or service provided by the plaintiff." 105 F.3d at 850, 853. The Publishers have pled facts sufficient to show all three. Indeed, the Publishers' "hot-news" claim is closely analogous to the hypothetical "hot-news" claim that the Second Circuit identified in *Barclays* as not preempted: "[i]f a Firm were to collect and disseminate … facts about securities recommendations in the brokerage industry … and [defendant] were to copy the facts contained in the Firm's hypothetical service, it might be liable to the Firm on a 'hot-news' misappropriation theory." 650 F.3d at 905-06; *see also NBA*, 105 F.3d at 854 ("[I]f appellants in the future were to collect facts from an enhanced Gamestats pager to retransmit them to SportsTrax pagers, that would constitute free-riding and might well cause Gamestats to be unprofitable because it had to bear costs to collect facts that SportsTrax did not."). Turning now to the three elements cited in *NBA*:

*Time-sensitivity*. The Complaint points to numerous examples of Defendants' misappropriating the Publishers' time-sensitive articles on the same day or within two days after the articles were published. *See* Compl. ¶¶ 118-19 (lunar eclipse; two days); 121-22 (triple homicide; one day); 124-25 (Yankees schedule; one day); 127-28 (Palm Beach schools; same day); 133-34 (Warriors are surging; one day); 136-37 (Lakers fix errors; two days). The Publishers have also pled the value of time-sensitive information, that local news provides "up-to-date information [that people] need to organize and plan their lives," and that "time-sensitive

breaking news … [comes] at a substantial cost to the Publishers, including the hundreds of millions of dollars and countless 'people hours' that the Publishers have spent in their commitment to investigate and accurately report local news to local communities…" *Id.*, ¶¶ 10, 227. The Publishers have won numerous awards for their time-sensitive reports. *Id.*, ¶¶ 43 (Pulitzer finalist – Pulse nightclub massacre and hazing tragedy at Florida A&M), 45 (Pulitzer Prizes – Columbine High School Massacre, Aurora Colorado shooting, back-to-back blizzards).

Microsoft argues that the Publishers did not define the term "time sensitive" news, did not allege that "Defendants' tools disseminate that time-sensitive news 'precisely at the point where profit is to be reaped'" (quoting *NBA* at 851), and did not allege "the quantity of copying nor the immediacy of distribution necessary to sustain a 'hot' news claim" (quoting *Fin. Info., Inc. v. Moody's Invs. Serv., Inc.*, 808 F.2d 204, 209 (2d Cir. 1986)). Mem. at 22. These fact issues, even if relevant, cannot (and need not) be resolved at this stage. *DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003). Microsoft did not cite any cases to the contrary. Neither of the cases Microsoft relies on were decided at the motion to dismiss stage. Both *NBA* and *Moody's* were decided on a full trial record. *See NBA*, 105 F.3d at 841; *Moody's*, 808 F.2d at 204.

*Free-riding.* The Complaint alleges several specific examples of Microsoft's Copilot's outputting synthetic content that includes verbatim text from time-sensitive stories. Compl. ¶¶ 118, 121, 124, 127, 130, 133, 136. The Complaint further points out that none of this synthetic output includes a prominent hyperlink that sends users to the Publishers' websites. *Id.* ¶¶ 120, 123, 126, 129, 132, 135. The Publishers further allege that "Defendants' use of the Publishers' content without the Publishers' consent constitutes free-riding on the Publishers' significant efforts and investment of human capital … allowing Defendants to reap the benefit of providing the time-sensitive content that had been gathered through the Publishers' efforts." *Id.* ¶ 230.

*Threat to the Publishers' Product/Service.* The Complaint contains an entire section on "Harm to the Publishers" that details the Publishers' subscription-based business model and how Microsoft's misappropriation undermines that business model by providing people the same products (news) that Plaintiffs provide but for free. *Id.* ¶¶ 184-89. "Defendants' misuse and misappropriation of the Publishers' content substantially threatens the Publishers' content and disincentives the Publishers to produce their content, threatening the continued viability." *Id.* ¶ 232. As such, Microsoft's allegation that the Complaint "fails to allege the GPT-based tools 'would so reduce the incentive to produce' its content 'that its existence or quality would be substantially threatened'" (Mem. at 22) is demonstrably false.

Finally, Microsoft has not cited a single case where a court has found a "hot-news" claim *preempted* at the pleading stage. Mem. at 23. *NBA* and *Moody's* were both decided on the merits, and none of three 12(b)(6) opinions that Microsoft cited in its conclusion concerned "hot-news" claims decided on preemption. Rather, in all three the courts found that certain elements of the "hot-news" claim were not sufficiently pled[8]—a deficiency that is not present here.

## D.   THE PUBLISHERS' DILUTION CLAIM (COUNT VIII) IS NOT BARRED BY THE DORMANT COMMERCE CLAUSE

Microsoft's most astonishing argument is that the Publishers' claim for dilution of business reputation under New York's Gen. Bus. Law § 360-1 (Count VIII) is barred by the dormant Commerce Clause. Mem. at 23-25. Microsoft's main argument is that the New York law impermissibly seeks to affect conduct outside of New York State. It then argues that

---

[8] *DBW Partners, LLC v. Mkt. Sec., LLC*, No. 22-CV-1333, 2023 WL 2610498, at *5 (D.D.C. Mar. 23, 2023) (failed to plead "passing off" because all copied material was allegedly attributed to plaintiffs); *Greer v. Fox News Media*, No. 22-CV-1970, 2023 WL 2671796, at *2 (2d Cir. Mar. 29, 2023) (summarily concluding that plaintiff did not adequately allege "time-sensitive" information, "direct competition" or "free riding"); *ML Genius Holdings LLC v. Google LLC*, No. 20-CV-3113, 2022 WL 710744, at *5-6 (2d Cir. Mar. 10, 2022) cert. denied, 143 S. Ct. 2658 (2023) (song lyric transcriptions are not information that is time-sensitive in nature)

companies operating on the internet should be treated differently from every other participant in the U.S. economy. Both arguments fail.

In *Nat'l Pork. Producers Council v. Ross,* 598 U.S. 356 (2023), which Microsoft cites, the Supreme Court rejected Microsoft's central premise. In a unanimous decision, the Court explained, "Companies that choose to sell products in various States must normally comply with the laws of those various States." *Id.* at 364. The Court upheld a state law under a dormant Commerce Clause challenge, notwithstanding the law's "practical effect" of "controlling extraterritorial commerce." *Id.* at 371. A contrary rule, the Court held, would "cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers." *Id.* at 375. Microsoft ignores these points, and refers instead to a single phrase in a footnote in which the Supreme Court distinguished a 1982 case striking a state statute in circumstances that have nothing to do with this case. Mem. at 23, citing *Nat'l Pork*, 598 U.S. at 376 n.1 (distinguishing *Edgar* v. *MITE Corp.*, 457 U.S. 624 (1982)).

Microsoft then refers to cases that (per Microsoft) hold "that state laws regulating internet companies violate the Dormant Commerce Clause when they directly control what the company may show users on a nationwide basis." Mem. at 24. As an initial matter, that is not what the Publishers' dilution claim is about. The claim under § 360-l rests on the fact Microsoft distributes content that it falsely attributes to one of the Publishers. Compl. ¶¶ 251-53. The issue in that claim is not just the content of Microsoft's output, it is the harm that content causes from Microsoft's false association of the Publishers with that content.

Microsoft relies on *Am. Booksellers Found. v. Dean,* 342 F.3d 96 (2d Cir. 2003). Whether *Booksellers* survived *Nat'l Pork* is doubtful. In *Booksellers,* the Court held, "Although [the statute] does not discriminate against interstate commerce on its face, we agree with the

district court that it presents a *per se* violation of the dormant Commerce Clause." *Id.* at 104. In *Nat'l Pork,* the Supreme Court rejected the "'almost *per se*' rule forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State, even when those laws do not purposely discriminate against out-of-state economic interests. 598 U.S. at 371.[9]

Ultimately, Microsoft asks this Court to wedge the Publishers' New York law claim into the narrowest of openings. According to Microsoft, the Publishers' § 360-1 claim fails because (Microsoft says) it "is an attempt to control the interactions between users of generative search technology and Microsoft despite their lack of any connection to the state of New York." Mem. at 25. This argument fails on two grounds. *First*, a dormant Commerce Clause challenge is directed to the statute, not to a claim under the statute. That is, the question in these cases is not whether a *claim* is constitutional, but whether the state regulation is constitutional. Microsoft doesn't challenge New York's statute itself.

*Second*, Microsoft's conduct does affect New York State in a number of important ways, as shown by the fact that the first-named plaintiff is a New York newspaper, and that the claim describes how Microsoft's products falsely attribute content to the Daily News. The argument regarding a "lack of connection" between New York and Microsoft on this issue is untenable.

## V.    CONCLUSION

For the reasons set forth above, the Publishers respectfully request that the Court deny the motion in its entirety, or in the alternative, grant leave to amend any claim that is dismissed.

---

[9] There other reasons to believe that *American Booksellers* did not survive *Nat'l Pork*. The Second Circuit in *Booksellers,* like Microsoft in its present motion (Mem. at 23), relied on broad readings of decisions that the Supreme Court narrowed in *Nat'l Pork*. Compare *Booksellers*. 342 F.3d at 103-4 (broadly reading *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986) and *Healy v. Beer Inst. Inc.,* 491 U.S. 324 (1989)) *with Nat'l Pork,* 598 U.S. at 375-77 (disclaiming the broad language in these decisions).

Dated: June 25, 2024 /s/ *Steven Lieberman*

Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Robert Parker (*pro hac vice*)
Jenny L. Colgate (*pro hac vice*)
Mark Rawls (*pro hac vice*)
Kristen J. Logan (*pro hac vice*)
Bryan B. Thompson (6004147)
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001
Telephone: (202) 783-6040
Facsimile: (202) 783-6031
slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
rparker@rothwellfigg.com
jcolgate@rothwellfigg.com
klogan@rothwellfigg.com
bthompson@rothwellfigg.com

Jeffrey A. Lindenbaum (JL1971)
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
The Holyoke-Manhattan Building
80 South Highland Avenue
Ossining, New York 10562
Telephone: (202) 783-6040
Facsimile: (202) 783-6031
jlindenbaum@rothwellfigg.com

*Attorneys for Plaintiffs*